# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2012

## STATE OF TENNESSEE v. MELISSA R. COLE

**Appeal from the Circuit Court for McNairy County**
**No. 2574     J. Weber McCraw, Judge**

---

**No. W2011-00893-CCA-R3-CD  - Filed October 15, 2012**

---

The defendant was found guilty by a jury of second degree murder, a Class A felony, arson, a Class C felony, and tampering with evidence, a Class C felony.  Prior to trial, the defendant pled guilty to an additional count of tampering with evidence, a Class C felony. She was sentenced to four years for the arson and three years on each count of tampering with evidence, with each sentence to run concurrently but consecutive to a twenty-one year sentence for the second degree murder, for a total effective sentence of twenty-five years. On appeal, the defendant claims that the evidence is insufficient to support her conviction for second degree murder and that the trial court erred by sentencing her to partial consecutive sentences.  After carefully reviewing the record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, J.J., joined.

Gary F. Antrican, District Public Defender, and Rickey Griggs and Shana Johnson, Assistant Public Defender, for the appellant, Melissa R. Cole.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Bob Gray, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

There is no dispute that on November 2, 2009, the defendant, Melissa R. Cole, shot

and killed her husband, Gary B. Cole. Their residence burned to the ground shortly afterward. On February 10, 2010, the defendant was indicted for first degree (premeditated) murder in violation of Tennessee Code Annotated section 39-13-202, aggravated arson in violation of Tennessee Code Annotated section 39-14-302, two counts of tampering with evidence in violation of Tennessee Code Annotated section 39-16-503, and employing a firearm during the commission of a dangerous felony in violation of Tennessee Code Annotated section 39-17-1324. Prior to trial, the defendant pled guilty to one count of tampering with evidence. The charge of employing a firearm during the commission of a dangerous felony was dismissed by motion of the State. At her trial on October 5-7, 2010, the following evidence was presented:

The first witness for the State was Special Agent Johnny F. Hayes of the Tennessee State Fire Marshall's Office. Agent Hayes testified that he had twenty-five years experience investigating bomb and arson cases, and during that time he had investigated several hundred suspicious house fires. He testified that he had significant training and experience determining the cause of, and point of origin of, structural fires. He testified that on November 3, 2009, he investigated a house fire on Harden's Graveyard Road in McNairy County. He testified that he was called in to investigate that fire because a body had been found inside of the structure. Special Agent Hayes testified that his partner, Special Agent Kevin Isley, was a trained K-9 handler and assisted him during his investigation. He testified that his investigation involved examining burn and fire patterns at the site of the fire and using a trained dog to help locate any evidence of the use of an accelerant.

Special Agent Hayes testified that it was dark when he arrived at the scene, and he did not perform any investigation that evening because of the danger that he might miss evidence. He testified that he taped off the crime scene and photographed it when he arrived, and he photographed it further the following day. He testified that the residence where the fire had occurred was destroyed.

He testified that he determined that the residence at issue had been a double wide manufactured home, and the fire that destroyed it had traveled from north to south. He testified that the floor of the house was burnt out in several places. A man's body was found in the living room area. He testified that he also searched the scene for two additional bodies, because he had been informed that the defendant and her son might also have been in the residence during the fire. No additional bodies were found.

Special Agent Hayes testified that he discovered burn patterns in the kitchen area of the residence that led toward the living room. Special Agent Hayes testified that fire always burns "up and out unless there's something to make it burn a different way, such as if you have an accelerant introduced." Special Agent Hayes explained that an accelerant, such as

a flammable liquid, runs down and leaves a burn pattern on any surface it touches as it moves. Special Agent Hayes testified that a fire will burn in a downward motion only if an accelerant has been introduced, as the accelerant will move downward toward the floor as it burns. Special Agent Hayes testified that "natural fire burns up and out." Special Agent Hayes testified that he discovered a downward burn during his investigation, and he took photographs of the affected area.

Special Agent Hayes testified that during his investigation he discovered a kerosene heater and some kerosene lanterns in the house. He testified that one of these kerosene lamps was found underneath the living room loveseat where the victim's body was found. He testified that he discovered four or five other lanterns in the living room. He testified that he also believed that he could smell petroleum distillate, an accelerant, coming from the ruins of the house. He testified that after discovering this evidence, he suspected that the fire had been set intentionally, and he directed Agent Isley to assist with his canine. Special Agent Hayes testified that he removed a piece of burned material hanging down from the floor of the kitchen and laid it on the ground. Afterward, the dog alerted on that material.

Special Agent Hayes testified that he interviewed several witnesses during his investigation. He testified he interviewed the victim's brother and two of the victim's neighbors concerning the kerosene heater that was kept in the residence, although his investigation had ruled out that heater as an ignition source. He testified that he did further investigation to eliminate other potential accidental causes of the fire, including electrical shorts, lightning, and cigarettes. He testified that none of those sources would have caused the particular burn patterns that he detected on the floor of the house. Special Agent Hayes testified that, in his expert opinion, the fire at issue was set intentionally.

Special Agent Hayes testified that partway through his investigation he was informed that a preliminary autopsy had indicated that the victim had been shot. He testified that afterward, he searched the house for guns. He found no guns near the victim, "thus eliminating suicide." He testified that he did discover several long guns in the bedroom area of the trailer. Following this testimony, Special Agent Hayes was shown several photographs of the crime scene, which he authenticated. These photographs were then entered into evidence, and he discussed them in detail.

On cross-examination, Special Agent Hayes testified that he did not believe that any of the kerosene lanterns that he found in the home had ignited the fire because he had not discovered any of them at the fire's point of origin. He testified that he did find kerosene lanterns at periodic locations throughout the residence in "places that they shouldn't have been." He testified that he believed that the lanterns were a "contributing factor" to the fire.

Special Agent Hayes testified that the fire at issue was extinguished when he arrived at the crime scene and that he was unaware of how the fire Department had extinguished the fire. He testified that in his expert opinion, the fire had probably been put out by high pressure hoses. He testified that it was possible that some of the items found in the house had been displaced by water coming from those high-pressure hoses. He testified that the defendant first became a suspect in the case on the first day of his investigation, after he received information from the victim's brother that there were marital problems between the defendant and the victim.

The next witness for the State was Special Agent Lara Hodge of the Tennessee Bureau of Investigation ("TBI"), the State's expert in microanalysis. She testified that she received a specimen of fire debris taken from the area of the rear side door of the fire scene. She testified that she analyzed that debris for the presence of ignitable liquids and that her test revealed the presence of a "medium petroleum distillate." She testified that this type of distillate includes accelerants such as paint thinners, mineral spirits, charcoal starters, and some dry-cleaning solvents. She testified that her tests revealed that the sample did not contain any kerosene.

On cross-examination, Special Agent Hodge testified she could only account for the condition of evidence once it came into her lab and that she would have no idea if someone had dipped the evidence into an accelerant prior to giving it to her. She testified that she received the evidence from Agent Kevin Isley on November 10, 2009. She testified that it was possible that the evidence could have been contaminated at some point between November 2, 2009, and November 10, 2009. She testified that she did not know whether the paint can used to transport the evidence to her lab was sterile.

The next witness for the State was Mr. William Darrell Goodrum, the Fire Chief of the Fire Department of McNairy County. He testified that he responded to a call on November 3, 2009, concerning a house fire on Harden's Graveyard Road. He testified when he arrived at the scene, the fire was largely extinguished and the victim's body had already been discovered.

Special Agent Kevin Isley was qualified as an expert in arson investigation and testified concerning his activities assisting Special Agent Hayes in investigating the fire at issue. He testified that his K-9 partner, Madison, was trained to attend fire scenes and identify whether any accelerants were present. He testified that during his investigation Madison alerted on a particular area. He testified that he gathered some material from this area and sent it to the TBI lab, where it tested positive for the presence of an accelerant.

Special Agent Isley also testified in detail concerning the procedures he used to collect

-4-

the sample and send it to the TBI lab. He testified that he packaged the evidence in a paint can and that this paint can had never had anything in it prior to being used to package the sample. He testified that he sealed the paint can and took other steps to preserve the integrity of the can's contents.

On cross-examination, Special Agent Isley testified that it was his normal procedure to try to get evidence from the crime scene to the TBI lab within two days. He testified that a copy of the evidence report from the TBI lab indicated that it was received on November 10, 2009. He testified that the extended delay was due in part to the fact that he was called out to Chattanooga to work on a different case during the intervening time. He also testified that the TBI lab did not accept evidence on weekends. He claimed that the remainder of the delay was due to him working on other cases or on other aspects of this case. He agreed that it was important to get evidence to the lab as quickly as possible. However, he testified that the reason it was important to do so was because during any delay vapors that were present in the sample might escape from the packaging, and as a result evidence that would otherwise have tested positive for an accelerant might test negative.

The next witness for the State was Mr. Lloyd R. Tatum, an attorney who was qualified as the State's expert in divorce and probate law. Mr. Tatum testified that he represented the victim during the victim's divorce proceedings. He testified that he filed a complaint of divorce on the victim's behalf on August 10, 2009, in McNairy County General Sessions Court. He testified that the divorce was uncontested and was filed on the grounds of irreconcilable differences. He testified that he also prepared a Marital Dissolution Agreement and a Permanent Parenting Plan for the parties. He testified that the defendant signed these documents on August 10, 2009.

He testified that the Marital Dissolution Agreement provided for the complete dissolution of the couple's property. Mr. Tatum testified that pursuant to the agreement, each party was going to retain their respective retirement plan. The defendant was to receive a white 2000 Cavalier vehicle and $10,000. Pursuant to the agreement, each party was to pay one half of any joint debts, and the defendant was to give title to the couple's residence to the victim. He testified that pursuant to the Permanent Parenting Plan, the victim was to gain custody of the couple's nine-year-old child, while the defendant was to receive "standard visitation rights." He testified that the parenting plan did not provide for any child support.

Mr. Tatum testified that in Tennessee there is a ninety-day waiting period before couples with minor children can go to court and have their divorce finalized. He testified that, as a consequence, the victim's divorce complaint would not be ripe for a hearing until November 10, 2009. He testified that it usually takes "about five minutes" to get a divorce finalized after a hearing is scheduled. He testified that the victim's divorce complaint abated

upon his death.

Mr. Tatum testified that he was contacted by the victim's brother for purposes of probating the victim's will. Mr. Tatum testified that he had prepared the victim's will, and he had done so shortly after the victim filed for divorce. Mr. Tatum testified that to the best of his recollection, the victim's will left everything to his child. He testified that pursuant to Tennessee probate law, even though the defendant was not mentioned in the victim's will, she was still entitled to at least ten percent of the victim's estate under Tennessee's "elective share" doctrine.

Mr. Tatum testified that he had encountered situations in the past in which there was evidence that one party had coerced the other into signing off on a divorce. He testified that for legal purposes, "a coerced signature is no signature at all." He testified that it was his job as a lawyer and an officer of the court to do his best to ensure that he did not present any documents to the court that were the result of coercion. He testified that he had no indication whatsoever that the defendant's signature on any of the documents had been made under duress or coercion. Finally, Mr. Tatum testified that he never received any communication from the victim requesting him to "put this divorce on hold."

On cross-examination, Mr. Tatum testified that the defendant had signed some of the documents in a location other than his office, and as a result it was possible that she could have been coerced into signing the documents without his knowledge. Mr. Tatum testified that the defendant received $2500.00 of the $10,000.00 that she was due on the same date that she signed the dissolution agreement.

Mr. Tatum testified that the date of separation listed on the parties' court papers was May 1, 2009, and that the documents stated that the "parties have not lived together as husband and wife" since that date. Mr. Tatum testified that he believed he received that date from the victim and that he did not know whether the defendant and the victim in fact still actually lived in the same house. Mr. Tatum testified that in his experience, individuals usually did not know the amount of money and property to which they were entitled under the divorce and probate statutes; it was not every day common knowledge.

Next, Mr. Tatum answered several questions concerning the net worth of the parties at the time of the victim's death. He agreed with defense counsel that the total value of their assets was $127,000.00. Assuming that the defendant would inherit ten percent of that figure, or $12,700.00, as her "elective share" in probate, and assuming that she was entitled to $10,000.00 under the terms of the divorce, Mr. Tatum agreed that it was at least arguable that the victim was "worth only $2700.00 more to [the defendant] dead than alive."

On re-direct examination, Mr. Tatum located the relevant statute concerning elective shares, Tennessee Code Annotated section 31-4-101, and determined that, assuming the victim and the defendant had been married between six and nine years, the defendant would have been entitled to thirty percent of the victim's assets as her elective share in probate. Mr. Tatum also testified that the defendant had already received $2500.00 of the $10,000.00 that she was due to receive under the terms of the divorce. Mr. Tatum testified that there was a court remedy available to any individual who was coerced or forced into signing divorce documents. He testified that he never received any communication from any attorney or from the defendant seeking to initiate such a proceeding.

The next witness for the State was former McNairy County Sheriff Ricky Roten. Mr. Roten testified that on November 3, 2009, he investigated a house fire at an address on Harden's Graveyard Road. He testified that he was called to the scene because there was the possibility of a body being in the house, and when he arrived he did in fact discover a body. He testified that this body was later identified by the medical examiner that of the victim.

He testified that after verifying there was a body in the house he became concerned about the location of the victim's wife and child. He testified that he had significant difficulty contacting the defendant. He testified that he called the defendant's cell phone several times during the early morning hours following the fire and that he never got an answer. He testified that sometime in the morning, he left a message, and afterward the defendant contacted his office and came in for an interview.

Mr. Roten testified that the defendant gave a signed written statement. He identified that document, it was entered into evidence, and he read it for the jury. In the statement, the defendant purported to lay out all of her activities on the day in question. She stated that on the day of the fire the victim had told her that he had started buying illegal prescription medicines because his medication would not last all month. She stated that the victim had told her that he was leaving for a few days and that he would not tell her why. She stated that the victim gave her a check and a bank card so that she would have money while he was gone. She stated that the victim told her to take their child to buy a portable game system and then to take him to a hotel. She stated that the victim told her that he would be gone when they returned. She stated that she followed the victim's instructions, but she eventually came home, and the victim was still there when she did so. She stated that the victim again told her to leave because he did not want for their child to see him leave. She testified that she left for a while and then returned and drove by the outside of their house again. She testified that after doing so she left and went to her mother's house.

Mr. Roten testified that after receiving the defendant's initial statement he continued to investigate the case, but he had no further contact with the defendant. He testified that the

defendant became a suspect sometime after her initial interview, when he had difficulty trying to get her to return for another interview. He testified that the defendant did eventually come back to the Sheriff's Department and that she was interviewed by Agent Ron Powers when she did so. Mr. Roten testified that parts of this second statement were inconsistent with the defendant's first statement. Specifically, in the second interview, the defendant indicated that she had shot the victim with a handgun. He stated that the defendant also indicated that she had thrown that gun somewhere off the road, and she gave Agent Powers an approximate location.

Mr. Roten testified that he, Agent Powers, and some other individuals went to the general area indicated by the defendant and located a handgun. After photographing this weapon *in situ*, he collected it into evidence and took it to the crime lab. He testified that the weapon was a .9mm handgun and that the gun had one round in the chamber and five rounds in the clip when it was discovered. Mr. Roten stated that the defendant identified this pistol to him as the one that she used to shoot the victim.

On cross-examination, Mr. Roten testified that the defendant voluntarily showed up for both of her interviews. He testified that he had been Sheriff of McNairy County since January 18, 2006, and he did not recall any prior incidents of trouble between the victim and the defendant. He specifically denied having any memory of taking the defendant to or from "the WRAP office" sometime in July of 2007.

Special Agent Ron Powers of the State of Tennessee Bomb and Arson Section took the stand and testified that he participated in the investigation of the house fire at issue by interviewing a possible suspect on November 5, 2009. He testified that he interviewed the defendant and identified her in open court. He testified that he took a written statement from the defendant, which was followed by an additional videotape statement. He testified that prior to interviewing the defendant he advised her of her *Miranda* rights, and she executed a written waiver of those rights.

Special Agent Powers testified that at no point during his interview with the defendant did she ever mention hiring an attorney. He testified that after signing her written statement, she stated some concern that if she did not give a statement, she would not be able to see her child. He testified that he replied to her that he did not care if she got an attorney or if she did not give a statement. Regardless of what she did, she would be able to see her child. He testified that he did not see anything about the defendant's appearance or her demeanor that would indicate to him that she was under the influence of any intoxicant or was acting under duress or coercion.

Special Agent Powers identified the defendant's second statement, and it was entered

-8-

into evidence. He read it for the jury. In that statement, the defendant stated that the victim told her that he was "on pills again," which upset her. She stated that the victim started accusing her of wanting to leave him, and then he retrieved his gun and told her that she was not taking their child anywhere anymore. She stated that they argued for a while and then things calmed down. She stated that the victim eventually stuck the gun under a T-shirt in the bedroom dresser. She asked the victim if she could change her clothes. When he gave her permission, she retrieved the gun and shot him while he was sitting on the sofa. She testified that she took her son shopping for the rest of the day before going to her mother's house.

After Special Agent Powers read the defendant's statement, a DVD of her confession was played for the jury. In the DVD confession the defendant added that after shooting the victim she kept the gun in her purse, and she covered the victim's body with a quilt. She also stated that when their son woke up, she walked him out of the house.

On cross-examination, Special Agent Powers testified that he was the only individual who had witnessed the defendant signing the written waiver of her *Miranda* rights. He testified that it was not unusual to have the same person witness a suspect's waiver and interview the suspect. He testified that although he recorded the defendant's interview, he did not bother to record her signing of the waiver. He testified that approximately thirty to forty-five minutes elapsed between the time that the defendant signed the waiver and the time she gave a written statement. He testified that the sheriff was present during portions of the defendant's written statement. He testified that the defendant was allowed to use the restroom and have drinks during her interviews and that the door to the interview room was open. He stated that he believed that the defendant was acting when she appeared to be upset during the interview, and although she appeared to be crying she never shed any actual tears.

Ms. Nelly Richardson, who handled human resources responsibilities for the victim's former employer, also testified on behalf of the State. Ms. Richardson testified that the defendant changed the beneficiaries on his two work-related life insurance policies – from the defendant and his son to his mother and his son – on June 13, 2009. She testified that to her knowledge the defendant would not have had any way of knowing about the change of beneficiaries. She testified that when the victim was laid off from his position with the company on September 3, 2009, he retained only $10,000 worth of life insurance coverage on a single policy. She also testified that the defendant called her office on the day after the victim's death and inquired about his life insurance coverage.

Mr. James Goodman, an insurance agent, testified that the victim contacted him approximately a month before his death to inquire about insurance to cover his home, as well as several tractors he owned. He testified that in conjunction with issuing a policy, he went

to the victim's house and had a conversation with the defendant concerning the coverage and necessary paperwork. He testified that he issued the victim $60,000 worth of coverage for his house and its contents shortly after his conversation with the defendant. He testified that two days after the fire, the defendant called to let him know that the house had burned down. A short time later he went to inspect the premises, determined that the house was a total loss, and filed a claim at the defendant's request.

The victim's neighbor, Mr. Jerry Capooth, testified that he had a good relationship with the victim and the defendant and that he could see their house from his house. He testified that as far as he knew the victim never used a kerosene heater, and he had never seen one in their residence. He testified that on the night of the fire he was woken by the smell of smoke, and he approached the victim's burning house. He testified that the fire was burning so "bad" by this time that he could not go inside, but he called from the outside of the house to see if anyone was inside. He testified that his wife called 911, and he believed that the time when all this occurred was between 1:00 a.m. and 2:00 a.m.

On cross-examination, the witness admitted that he was closer to the victim than he was to the defendant and that he and the defendant had once swapped prescription pain medication. He testified that he was aware that the victim and the defendant had marital problems, although he testified that he had never seen the victim act violently towards the defendant. He testified that he did not remember telling firefighters on the night of the fire that the victim had an "anger problem."

Mr. Capooth's wife, Ms. Carmellitta Capooth, also took the stand. She testified that she saw the victim and the defendant three or four times a week. She testified that she had never seen any sign of any marital disagreements or problems between the victim and the defendant. She testified that on the night of the fire, her husband woke her, and together they went over to the victim and the defendant's house, which she discovered was on fire. She testified that it was between 1:30 a.m. and 2:00 a.m. when they arrived at their neighbor's house.

The next witness for the State was Ms. Mabel Cole, the victim's mother. The victim's mother testified that she and the victim had a very close relationship and that the victim called her three times a day. Ms. Mabel Cole testified that at 11:00 a.m. on the morning before the fire she returned home to find a message on her answering machine from the defendant telling her that the victim had gone to Memphis to hunt for a job. She testified that the defendant called her later that day and further explained that she believed that the victim "just want[ed] to get away." She testified that she found this situation to be unusual, because the victim would normally call her with that sort of information.

Ms. Cole further testified that she was familiar with the victim's handwriting, and she identified his signature on a $2500.00 check made out to the defendant as part of the divorce settlement. She then identified two more checks drawn on his account, and she stated that the signature appearing on those checks was not made in the defendant's handwriting.

The next witness for the State was the son of the victim and the defendant. He testified that he was ten years old. He testified that something had awakened him at 7:24 a.m. on November 2, 2009. He testified that his mother "rushed in" to his room, "said that she had dropped a Christmas present," and told him that he should stay in his room for about half an hour. He testified that about twenty minutes later the defendant came back into the room and took him out. He testified that the defendant told him that the victim was asleep.

He testified that he saw the victim – who was covered and appeared to be asleep – on the loveseat in the living room. He testified that they left the house and the defendant gave him twenty dollars. He testified that they drove to the bank, and the defendant took out some money and gave him another hundred dollars. He testified that they went to Wal-Mart and bought some groceries and toys. He testified that after this they went to Game Stop and the defendant spent several hundred dollars buying him video games. Next, they went to the Dollar Store, where the defendant bought some Pine-Sol and a new mop.

When they returned to the house, the victim's son saw that the victim was still on the sofa and had not moved at all. He played video games for a while, and then the defendant took him back to the Dollar Store, where she bought him some new shoes and a toy gun. After they returned home around 11:00 p.m. that evening, the defendant started complaining to him about her heart. They went back to Wal-Mart so the defendant could get some liquid heart medicine. The witness testified that when they returned home, the defendant told him to remain in the car while she made a phone call. After a few minutes he started to smell something and got out. The defendant came out of the house and yelled at him to get back in the car.

The witness testified that he smelled smoke and that he told the defendant that he smelled something. The defendant told him that it was probably their neighbor burning something, and they left and went to her mother's house. Several hours later the defendant received a phone call from the victim's brother, after which she informed him that their house had burned down and that his dad was dead. The witness testified that sometime afterward, the defendant told him that she had shot the victim.

On cross-examination, the witness testified that he was home-schooled. He testified that his dad was never "mean" to his mom and that he had only hit her one time, while they

were all on vacation in Miami. He testified that the police were called on that occasion, and the victim went to jail for three days. The witness also testified that the victim would drink a lot on occasion, especially at certain times after getting laid off.

The witness testified that he was aware that the defendant and the victim were in the process of getting a divorce. The witness testified that, at some point prior to his death, the victim had asked him if he wanted for the defendant to stay. The witness testified that he told the victim that he did. The witness testified that as a consequence, the defendant stayed in the house with the victim during the divorce process. He also testified that while the victim and the defendant had their share of arguments, he had never seen those arguments get physical.

The witness also testified that his uncle had helped him prepare for his testimony in court by asking him questions and going through his answers. He testified that they had done this twice, including one time four days prior to his testimony.

The final witness for the State was Mr. John Cole, the victim's brother. Mr. John Cole testified that he lived approximately 400 feet from the victim and spoke with him two or three times a week. The witness testified that prior to the divorce, the victim and his family would visit their home frequently. The witness testified that he had never seen the defendant mistreat the victim or subject her to any physical abuse. He testified that he had never seen the defendant with a bruise, scrape, or cut on her body.

The witness testified that he was familiar with the victim's house, and he had installed the victim's electricity. The witness testified that he was also familiar with the victim's heating system and that the victim used central heat and air. The witness testified that the victim also used kerosene heaters to supplement his heat on especially cold days. The witness testified that the victim did not store any fuel for the heater in his home.

On the night of the fire, the witness testified that he was awoken early in the morning by his neighbor, Mr. Jerry Capooth, who was blowing his horn on his truck and telling him that his brother's house was on fire. When he arrived at the house, "[i]t was an inferno." He learned from a fireman that his brother's body was found inside.

The witness testified that he was appointed as the executor of the victim's estate. He testified that over the course of performing this duty he became familiar with the victim's signature. He identified the victim's signature on a check made out to the defendant in the amount of $2500.00. He was also shown a check dated November 2, 2009, in the amount of $2000.00, which was made out to the defendant. He testified that the signature on that check was not his brother's signature.

-12-

The witness further testified that in the course of fulfilling his duties as executor, he found several financial irregularities in his brother's business records. These irregularities included charges for over $2400.00 that were made on the victim's debit card on the day of his death. In addition, the records reflected that there were checks allegedly written to various ministries supported by his brother, but these checks were never received by these ministries. The records also reflected several checks that were written to pay various bills, but he discovered that these bills were never paid. The witness testified that his brother had always been very conscientious about keeping his debts paid.

Following this testimony, the State rested and the defense presented evidence. The first witness for the defense was Ms. Beatrice Standridge, the defendant's mother. The defendant's mother testified that she first met the victim in July of 1999 when he was still her daughter's boyfriend. She testified that the couple's son was born in February of 2000.

The witness testified that the defendant's demeanor changed tremendously after she became involved with the victim. She testified that the defendant was not as friendly or outgoing as before, and their prior "closeness drifted away." She testified that she used to see her daughter every day before she became involved with the victim, and afterward she only saw her once every three or four weeks.

The witness testified that sometime around late 2001, the victim and defendant moved away and that after that she only saw the defendant once every couple of years. The witness testified that she never heard from her daughter outside of those visits. She testified that, on one occasion, she visited the defendant's home when the defendant called her and asked her to come take her "home." She testified that when she arrived to do so, she entered the residence through the back door and immediately saw a half gallon of vodka and a half gallon of whiskey sitting out on the kitchen table next to a pistol. She testified that the defendant was "not a drinker." The witness also testified that she saw "an arsenal of weapons" in the bedroom.

The witness testified that the defendant left with her and came to stay with her at her house. The witness testified that when they arrived, the defendant told her to cover all of her windows with sheets and blankets. The witness also testified that the defendant instructed her not to leave the door open or stand by the window. She testified that the defendant stayed with her for about four days before eventually leaving to take her son to the emergency room. When she returned from the emergency room, she left without explaining where she was going and without showing any emotion.

The witness testified that she saw the defendant again in 2007 after receiving a phone call from a "WRAP" safe house in Jackson. She testified that she picked the defendant up

from that location and took her back to her house, where she stayed for about two and a half weeks. The witness testified that the defendant left while she was still in the hospital recovering from open heart surgery. She testified that she was not aware of the circumstances surrounding the defendant's departure.

On cross-examination, the witness testified that she loved her daughter and did not want to see her convicted of a crime. She testified that after the defendant left the victim in late 2001, they went to the police station in Jackson together to file a complaint. The police informed them, however, that they "couldn't file a complaint unless [the victim] actually did something." The witness also testified that the defendant had never told her that she had actually shot the victim.

The next witness for the defense was Ms. Tammy Broadwater, the defendant's sister-in-law. Ms. Broadwater testified that she had been friends with the defendant since childhood and that they had been close until twelve years ago, when the defendant met the victim. She testified that since the defendant had gotten involved with the victim, she had seen her approximately five times. She testified that the victim moved in with the defendant sometime in 1999.

The witness testified that she received a call from the defendant on the day after New Year's of 2000. During this phone call, the defendant asked the witness to come get her from her home. The witness agreed. The witness testified that she when she arrived at the house no one answered the door. She testified that she did not see the defendant until four days later.

The witness testified that she saw the defendant again in the summer of 2007, when the defendant visited her mother's house while the witness was also present. She testified that the defendant's mother had just had open heart surgery. She testified that she and the defendant had just finished giving the defendant's mother a bath and were sitting on a porch swing outside when the victim drove past them in a truck. She testified that the victim slowed down as he passed and she was able to see him holding a cell phone. She testified that the defendant answered her own cell phone and that, after the defendant did so, she overheard the victim tell the defendant that she needed to bring their son home or he would kill everyone in the family, including the children. She testified that the defendant went inside. The witness testified that she became afraid, picked her own son up, and took him home. She testified that the defendant was gone when she returned that evening.

On cross-examination, the witness acknowledged that the incident that she had just described was "very frightening" and probably involved numerous criminal violations. She testified that she did not go to the police department or file a police report concerning the

incident because she was suffering from posttraumatic stress syndrome and was afraid for the safety of her son. She testified that she told no one about the incident. The witness also acknowledged that she was taking at the time of the incident, and was still taking at the time of her testimony, a number of different prescription drugs including Zoloft and Xanax.

The next witness for the defense was Mr. William Wayne Lipford, who testified that he became acquainted with the defendant and the victim by virtue of performing occasional work on the victim's tractors. Mr. Lipford testified that on one occasion the defendant was involved in a car accident, and the victim took her car to him to be repaired. He testified that part way through performing the agreed-upon repairs, the victim came to his residence while drinking alcohol and told him that he was not going to pay him any money for the repairs.

The witness testified that approximately three and one-half years prior to the trial, the victim and the defendant attended a cookout at his house. The witness testified that during this cookout he told the victim "I don't care for your drinking at my house" and also cautioned the victim against using "dope" on his premises. The witness testified that sometime later, he saw the victim become angry at the defendant. The witness testified that the victim slammed the defendant's head into the wall, creating a hole in the paneling of his house the size of her head. He testified that he came to the defendant's assistance on that occasion by attempting to pull the victim off of the defendant. He ultimately kicked the victim "in the straddle." He testified that a day or two after this incident the victim came over to his house and apologized. He testified that the victim offered to fix the hole in his wall, but he told the victim not to worry about it. He testified his girlfriend, Kim Paynor, also witnessed this incident. The witness also testified that he saw bruises on the victim's legs on multiple occasions.

On cross-examination, Mr. Lipford testified that he was presently unemployed and drawing Social Security disability. He testified that he suffered from nerve problems and occasional seizures. He testified that the seizures sometimes interfered with his memory. He testified that he was taking Neurontin and Xanax to treat his problems. He testified that after witnessing the violent incident discussed in his direct testimony he did not call the police because he was friends with the victim, and he did not want to get "tangled up in none of it." The witness also acknowledged that he had been previously convicted of theft.

Ms. Kimberly Paynor, Mr. Lipford's girlfriend, took the stand for the defense and testified that she had seen the victim act in an abusive manner toward the defendant on several occasions. She testified that she saw the victim choke the defendant on one occasion while they were over at her house. She testified that the victim did not let go of the defendant until Mr. Lipford kneed him in the groin. The witness also testified that she had seen the victim "pop" pills, and mix pills with alcohol, on numerous occasions. The witness

testified that she has seen the defendant about once a week in the year before the victim's death and that the defendant often indicated to her that she was afraid of the victim.

On cross-examination, the witness testified that she had lived with Mr. Lipford for five years but that she and Mr. Lipford had never talked about their testimony prior to coming to court. The witness testified that she was presently unemployed and collecting Social Security disability benefits because of her nerves. She testified that she was presently taking Fluoxetine, Metropolol, Metformin, Trazodone, Flurosyn, and other medications for her various ailments. She testified that none of these medications interfered with her memory. Upon being asked, the witness also initially denied that Mr. Lipford had ever been arrested for committing an assault, but after a reminder from the prosecutor, she agreed that he had been arrested for assault in April of 2007.

Next, Ms. Margaret Cole,[1] the Executive Director of the Women's Resource and Rape Assistance Program ("WRAP"), took the stand for the defense. Ms. Cole testified that her organization generally provides services to the victims of domestic and sexual violence, including therapy, shelter, counseling, and group support. She testified that she was the custodian of records for the organization and that she maintained records in conjunction with each and every potential client who approached the program.

The witness was shown an intake sheet, dated July 2, 2007, concerning the defendant, which she identified and which was entered into evidence. The witness then read various statements from that intake sheet including "[t]he client stated the last time she was physically assaulted was two weeks ago," and "[t]he client stated her abuser threatened to kill her in front of their son." The witness testified that she had no information concerning the validity of any of the statements made on the intake sheet. The witness testified that her records indicated that the defendant was interviewed to be admitted to a shelter on July 5, 2007. The case notes also indicate that the defendant left the shelter on July 6, 2007, when she was picked up by her mother.

On cross-examination, the witness testified that she had no way of independently verifying any of the claims made by an individual seeking shelter with the organization. The witness also testified that the victim stayed with the organization for less than four days, from July 2 to July 6. On re-direct examination, the witness testified that her records reflected that the defendant was referred to WRAP by the McNairy County Sheriff's Department. On re-cross examination, the witness indicated that it was possible that this information had also come from the defendant.

---

[1] It does not appear from the record that this witness was related to either the defendant or the victim.

The next witness for the defense was Ms. Jane McCaig, who testified that she was acquainted with the defendant because her husband did some work for the victim, including some mechanical work on the victim's tractors. She testified that she first became acquainted with the defendant toward the end of 2002. She testified that she would sometimes accompany her husband when he would go over to the victim's house to perform work, and she sometimes saw the defendant when the defendant would pick up her child from school (as the witness's child attended the same school). The witness testified that the defendant's demeanor when she was away from her home was "outgoing" and "friendly." She testified that the defendant's demeanor at home, in front of her husband, was withdrawn – for example, her head and her hands would hang down by her side.

The final witness for the defense was the defendant. She testified that she met the victim at her place of employment in late 1998, and she had been married to the victim since 2001. She testified that in 2000, she and the victim were involved in an accident in which they were hit by a tractor-trailer. She testified that she, the victim, and their child each received settlements from this accident, all of which the victim put into his checking account. She testified that the victim began to hit her soon afterward.

The defendant testified that she and the victim moved to McNairy County in 2003 or 2004. She testified that the residence where they lived was titled in the victim's name. She testified that their son had attended public school for two years, but he had been withdrawn – at the victim's request – because he was being taught subjects that were not "exclusively religious" and "wasn't allowed to be around blacks."

The defendant testified that she had heard her mother's testimony concerning an incident in which her mother had come to pick her up from her house. She testified that she called her mother on that occasion because she was afraid that the victim was going to hurt her. She testified that she eventually returned to the victim's house afterward because the victim came to the hospital where she had taken their son and threatened her. She testified that he told her that he would hurt her family if she did not come home.

The defendant also testified that she had heard her sister-in-law's testimony concerning a separate incident that occurred in 2007. She testified that the victim was "drinking pretty bad then and it didn't take anything to set him off when he was drinking." She testified that the victim got mad at her. She wanted to leave, but he blocked all the doors. She testified that she could hear her sister-in-law "banging" on the door and screaming her name outside, but she could not answer the door. She testified that she saw her sister-in-law four to five days later, but she did not explain what had happened because she was afraid that the victim would hurt her.

The defendant testified that the victim owned numerous firearms. The defendant claimed that the victim had "said that he was a marksman in the Marines and that he could shoot my mother in the head from a mile away." The defendant testified that she eventually lost all contact with her family because the victim would not allow her to see them. The defendant testified that she was allowed to leave the house for shopping purposes, but that every time she did so the victim would put her on a schedule, leaving her with just enough time to go to the store and come home.

She testified that, on one occasion while she was out shopping in 2003, she was involved in a rear-end collision and had to file a police report. She testified that she was gone longer than she was supposed to be on that occasion and that when she arrived home the victim slapped her. She testified that after dinner she told the defendant what had happened. The victim responded by pushing her down on the bed and hitting her repeatedly.

The defendant also testified concerning the incident discussed in Ms. Paynor and Mr. Lipford's testimony. She testified that on this occasion, she was outside "petting puppies" when the victim became angry because she had bent over in order to do so and was displaying her rear end. She testified that all she could remember about the incident was being grabbed and slammed into a wall. The defendant testified that when they arrived back home that evening, the victim pretended like they were going to have makeup sex, but after she got undressed, the victim choked her and stuck a gun up her vagina. The defendant testified that the victim forced a gun up her vagina on numerous occasions and would only stop when he ejaculated.

The defendant also testified that on one occasion in 2000, she and the victim went to Mexico on vacation and stayed at a hotel. She testified that the victim hired a prostitute and requested that she have sex with her. The defendant stated that she refused the victim's request, went into the bathroom, and locked the door. The defendant testified that on another occasion when the couple was vacationing in Florida, the hotel where they were supposed to stay could not find their reservation. She testified that she made a phone call concerning the reservation while the victim drank at a nearby bar. She testified that after thirty minutes, the victim returned, accused her of "sleeping with the guy behind the desk," and lunged at her while she was in the hotel lobby. She testified that the authorities were called and the victim was arrested on this occasion. She testified that the victim spent the next three days in jail and was only released in time to catch the flight home.

The defendant testified that the victim was a heavy drinker and also took morphine pills. She testified that Mr. Jerry Capooth sold him some of the pills. She testified that the victim would act "awfully" when he mixed alcohol and pain medication.

The defendant testified that on the day of the victim's death, she told him that she did not want him taking any more "medicine." She testified that, in response, the victim went "ballistic." She testified that afterward the victim sat down on the living room loveseat, and she sat on the couch while they continued to converse. She testified that the victim told her that she was not going to leave and that she was not going to take their son away from him again. She testified that the victim got a gun, pointed it at her, and again told her that she was not leaving. She testified that she asked for permission to go to the bathroom. The victim acquiesced but accompanied her and watched her while she did so. The defendant testified that she eventually saw the victim put the gun under a stack of T-shirts on the dresser, which she testified was unusual because the victim generally did not leave guns out after threatening her – instead always locking them away in the gun cabinet. She testified that she asked for the victim's permission to don some additional clothes, then she walked over to the dresser, picked up the gun, walked over to the victim, and shot him.

The defendant testified that she never left the victim because the victim would not let her leave. She testified that even after she had gained control of the gun she did not feel safe attempting to leave, because the victim was bigger than her and because she believed that he would have disarmed her if she had tried to do so. She testified that she felt like she had no recourse but to shoot the victim because all of her prior attempts to obtain help or to leave him had failed. The defendant also testified that she did not burn down the residence.

The defendant testified that although the victim had filed for divorce, he came home later that same day and told her that she was not leaving. She testified that she begged the victim for a divorce, but the victim would not agree. She testified that the victim told her that the divorce would never be final. She admitted that she withdrew money from the victim's bank account following his death.

On cross-examination, the defendant was questioned extensively concerning the numerous prior inconsistent statements she had given to police. She was also questioned extensively concerning: (1) the numerous romantic messages she had written to the victim on holiday and Valentine's Day cards over the years; (2) a prior written statement in which she had admitted to stealing from the victim; (3) her ongoing financial problems; and (4) why she had not left the victim on various occasions when the opportunity to do so had presented itself. The defendant also admitted that she had never sought any medical attention for any of the alleged physical abuse that she had described in her direct testimony. On re-direct examination, the defendant testified that the reason she never sought any such medical attention was because she was afraid that the victim would further abuse her afterward.

After receiving this evidence the jury was instructed, the parties gave closing arguments, and the jury retired to deliberate. They returned with a verdict of guilty of the

lesser-included offense of second degree murder, guilty of the lesser-included offense of arson, and guilty of one count of tampering with evidence.

On October 28, 2010, the trial court held a sentencing hearing during which it took evidence. After introducing the defendant's presentence report, the State presented the testimony of Mr. John Cole, the victim's brother, who gave a victim impact statement. The witness testified that the victim's mother – who had just lost another son to brain cancer and had been battling with depression – had been impacted terribly by the crime. He also testified that he was having a difficult time coping with the loss of his brother, "continually looking toward [the victim's] house every morning when [he would] drive-by," and also looking up the hill in the evening, where a light used to be, and seeing only darkness. The witness testified that the loss of his brother was impacting his work performance at the Tennessee Valley Authority, where he worked at a very critical, high voltage, "life or death type of job." He testified that since the murder he had become distracted at work, and on occasion lives had been endangered as a result.

The witness testified that the victim's son was also having a difficult time coping with the victim's death. He testified that the victim's son was having "some pretty hard times academically." He testified that although the victim's son was supposed to have been receiving home schooling, when he was re-introduced to public school, he was "way behind." He testified that the victim's son told him that the defendant had only taught him once every week or two. He also testified that the victim's son had been subjected to ridicule at school because of his mother's crimes. Finally, he testified that the victim's son was having anger issues because of the murder, for which he had received professional counseling.

The witness then read a statement from the victim's mother, in which the victim's mother stated that she was heartbroken by the loss of her son. The victim's mother also claimed that the defendant was lying about the defendant finding her and bringing her home whenever she tried to leave. The victim's mother claimed that after leaving home the defendant would call the victim whenever she ran out of money, and the victim would always allow her to come back home.

The witness also read a prepared statement in which he attacked the defendant for killing the victim when "she would have been divorced in eight days." He complained that the defendant had told her "story" to the newspapers, which had "printed the lies that she told," while his brother was dead and was "not around to defend himself." He claimed that the defendant had falsified documents and otherwise deceived the victim continually during the time that the two were together.

The witness also stated that the defendant had stolen money from the victim in the

-20-

past. He claimed that the defendant only "began to cry abuse" and "went to the WRAP organization after [the victim] confronted her about stealing a large sum of money from their account." The witness stated that the victim had followed the defendant when she left home not because he wanted to bring her back, but because he wanted to make sure that his son was staying at a place that was "clean" and "warm."

The witness stated that he did not believe that the victim had ever sexually molested the defendant because the victim's failing health would not have permitted him to do so. He claimed that the defendant had never worked a single day since she had married the victim and that she had never gotten a job to help pay for the groceries even though the victim had asked her to do so. The witness concluded by observing that all of the parties' pain and suffering could have been avoided if the defendant had not been so greedy.

On cross-examination, the witness admitted that most of the information contained in his statement had come from the victim and that he did not have personal information concerning much of it. The witness also admitted that he was not certain which parent had been given responsibility for home-schooling the victim's son.

After this testimony, the State rested. The defense called Dr. Lynn Zager to the stand, and she was qualified as an expert in mental health. Dr. Zager testified that she spent two hours and forty-five minutes with the defendant in jail performing a mental health evaluation. Dr. Zager testified that based on this evaluation she had concluded that the defendant suffered from two mental health conditions – major depressive disorder and posttraumatic stress disorder. Dr. Zager testified that the defendant had told her that she had witnessed physical abuse occurring between her parents. Dr. Zager testified that "the latest research" told her that children who witness physical abuse between their parents suffer from serious problems later in life. She also testified that the defendant had told her that she had been abandoned by her father when she was six years old. She testified that, in her expert opinion, this had been a "stressor" in the defendant's life.

Dr. Zager testified that the defendant had told her that when she was six years old, another traumatic incident had occurred. The defendant could not remember what this incident was, but she remembered that "she was found hiding in a utility room between the dryer and a wall" afterward. The defendant told Dr. Zager that this incident involved "her grandmother's husband at the time." Dr. Zager opined that this incident "was a precursor to what I believe is a posttraumatic stress disorder that she suffers from." Dr. Zager testified that the defendant told her that she loved the victim and had expressed tremendous remorse about what had happened, but she had also related that her marriage was abusive.

Dr. Zager testified that the defendant's major depressive disorder and posttraumatic

stress disorder both played a major role in her decision to kill her husband. Dr. Zager stated that the defendant had told her that the victim had held a gun on her on several occasions and that, according to the defendant, the victim had made eye contact with her and told her that this was the last day of her life on the day that he died. Dr. Zager expressed her opinion that the victim's actions were a very significant factor leading to the defendant's decision to shoot him. Dr. Zager also opined that the defendant suffered from low self-esteem and battered wife syndrome, which prevented her from leaving the victim. Dr. Zager testified that "[t]he research says without a doubt that the most dangerous time for a woman is when she tries to leave and in the course of the relationship, they learned that it doesn't do them any good to leave; things just get worse, so they don't try."

Dr. Zager testified that the defendant had experienced significant crying spells and social withdrawal during her time in jail. As a result, the jail staff had given her an antidepressant, which was helping her. Dr. Zager testified that the defendant's mental condition had some bearing on her decision to kill and burn the victim.

On cross-examination, the witness acknowledged that "everything" about which she had just testified was in some way dependent on what she had been told by the defendant or the defendant's family – with the exception of some information that was contained in a police report from Florida that she had reviewed. Dr. Zager acknowledged that there was nothing to substantiate the allegations made by the defendant. Dr. Zager also acknowledged that there had been a great deal of public awareness concerning posttraumatic stress disorder and that the public had generally come to understand its manifestations. Dr. Zager asserted, however, that she did not believe that the general public was aware of the diagnostic criteria used by health professionals with respect to posttraumatic stress disorder. Dr. Zager concluded by agreeing that people are generally responsible for their own actions.

The defendant also took the stand. She testified that she was aware that she had not been truthful with the police the first time that she was interviewed concerning her actions on the day in question. She testified that she took responsibility for her actions when she was interviewed by police a few days later. She testified that she did not agree with the jury's guilty verdicts, but she had come to accept them. She testified that if she had the opportunity to do everything over, she might not do the same thing again, if she could find "a way to stop it." She testified that she was truly sorry for what had happened.

The defendant also read the following statement into the record:
My husband has abused me for years. I was isolated from family and other people. On the day this happened he raped me with a gun and told me that it was my last day on Earth. He said no one would look for me because my family didn't know where I was anyway and he would tell his family I just left

-22-

again. I feared for my life at the time this happened. I'm sorry it happened. I wish I could have stopped it before it got to this point. I didn't know what to do. When I left he came after me. I told Ricky Roten that Gary said he would kill me and all he did was take me to get an order of protection. I needed help and no one would listen. It was always my word against his.

On cross-examination, the defendant acknowledged that her son did not have a father or a mother because of her actions. Following her testimony, the defense rested.

At the close of evidence, the trial court sentenced the defendant to twenty-one years for second degree murder, fours years for arson, and three years for each count of tampering with evidence. The court ordered the defendant's sentences for arson and evidence tampering to run concurrently with each other but consecutively to her murder sentence. The defendant filed a timely motion for new trial, which was denied on April 18, 2011. A timely notice of appeal was filed, and the matter is now properly before this court for review. Our decision follows.

## ANALYSIS

The defendant claims that the evidence is insufficient to support her conviction – with respect to her second-degree murder conviction only – and that the trial court improperly ordered her sentences for arson and evidence tampering to be served consecutively to her sentence for second-degree murder. For the reasons that follow, we affirm the judgments of the trial court.

## I.

The defendant claims that the evidence is insufficient to support her conviction for second degree murder. We disagree.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Great weight is given to the result reached by the jury in a criminal trial; a jury's verdict of guilt strips the defendant of the presumption of innocence, and replaces it with a presumption of guilt, which the defendant must strive to overcome on appeal. *Dorantes*, 331 S.W.3d at 379. Matters such as the credibility of witnesses, the weight given their testimony, and the proper resolution of any conflicts in the

-23-

evidence are the province of the jury as the finder of fact and will not be revisited on appeal. *See id.* During appellate review, "the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (internal quotation omitted).

In the case at bar, the defendant was convicted of second degree murder. Second degree murder is defined as, *inter alia*, the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2009). The evidence in the record suffices to support a conclusion by a reasonable jury that the defendant knowingly killed the victim. The defendant herself testified that she took a gun and shot the victim.

In addition, law enforcement witnesses testified that they discovered the victim's burned body in the remains of the house that the defendant shared with the victim. They testified that they determined through further investigation that the victim had died prior to the fire from a gunshot wound to the head. These witnesses also testified that the defendant admitted to killing the victim and that she took them to the location where she had disposed of the murder weapon following the shooting. Copies of the defendant's confession (and prior inconsistent statements that she made to investigating officers) were in evidence. In sum, there is ample evidence to support the jury's conclusion that the defendant knowingly killed the victim.

The defendant also asserts that she "should have been convicted of a lesser included offense rather than second degree murder. In support of this proposition the Defendant respectfully directs this Court's attention to her testimony and to that of other defense witnesses regarding the abusive relationship with her husband." The next lesser included offense of second degree murder is voluntary manslaughter, which "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-310. The primary difference between voluntary manslaughter and second degree murder is the presence of provocation sufficient to reasonably produce an extreme state of passion.

The defense did present testimony from which a reasonable jury could have found such adequate provocation. As previously discussed, defense witnesses testified that the victim physically abused the defendant, and the defendant herself testified that the victim physically abused her on the day that she killed him. However, the jury was not required to credit this testimony.

Juries are tasked with assessing the credibility of trial witnesses, and are generally free to reject, in whole or in part, the testimony of defense witnesses. *See State v. Farmer*, 2012 Tenn. LEXIS 513, at *5 (Tenn. Aug. 22, 2012); *State v. Sexton*, 368 S.W.3d 371, 389 (Tenn.

2012); *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008). In the case at bar, during the defense's case-in-chief, the jury listened to multiple witnesses testify that the victim abused the defendant. However, during the State's case-in-chief, the jury also heard: (1) neighbors testify that they observed no physical abuse occurring between the victim and the defendant despite being in a position to do so; (2) law enforcement witnesses testify that the defendant did not claim to have suffered any abuse at the victim's hands until days after the victim's death, despite having ample opportunity to do so; (3) law enforcement witnesses testify that there was no record of the defendant reporting any abuse prior to the murder; and (4) the defendant's son testify that he witnessed only a single isolated incident of abuse between his mother and father.

The jury was responsible for assessing the credibility of these witnesses and reconciling the conflicts in their testimony, and this court ought not usurp the jury's role. The defendant's claim that the evidence is sufficient to support a conviction of only a lesser-included offense is denied.

## II.

The defendant also challenges the trial court's decision to order her to serve her concurrent sentences for arson and evidence tampering consecutive to her sentence for second degree murder. A defendant challenging her sentence bears the burden of demonstrating that her sentence is erroneous. *See State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). The decision of whether to impose consecutive sentences "is a matter addressed to the sound discretion of the trial court." *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). A court may order consecutive sentences if it finds by a preponderance of evidence that, *inter alia*, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). Consecutive sentencing is also subject to the general sentencing principles that the defendant's overall sentence be "justly deserved in relation to the seriousness of the offense" and not "greater than that deserved for the offense committed." T.C.A. §§ 40-35-102(1), -103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). When imposing consecutive sentences on the grounds that the defendant is a dangerous offender, sentencing principles require that, in addition to finding that the defendant committed "dangerous offenses," the trial court find that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.3d 933, 939 (Tenn. 1995). These requirements stem from the fact that the "dangerous offender" factor does not have any "self-contained limits" – as do the other factors supporting consecutive sentencing – and thus additional findings are required to prevent this factor from being too "subjective" and "hard[]

-25-

to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, as the State concedes, the trial court failed to make the required *Wilkerson* findings. The trial court's analysis concerning consecutive sentences consists only of a single conclusory statement: "The court does find the defendant to be a dangerous offender whose behavior indicates little or no regard for human life which permits the consecutive sentences." The trial court cited no evidence in support of this conclusion.

When a trial court imposes consecutive sentences on the grounds that the defendant is a dangerous offender without making the requisite *Wilkerson* findings, and when it has cited no other basis for imposing consecutive sentences, this court may review of the record to determine if the *Wilkerson* factors are satisfied. *See, e.g., State v. Carlos Alvarez Levy*, No. M2006-01448-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 290, at \*11 (Tenn. Crim. App. Apr. 4, 2007) ("Notwithstanding [the trial court's] failure [to make the *Wilkerson* findings], following *de novo* review, we conclude that consecutive sentencing is also warranted on the ground that the Appellant is a dangerous offender."). In this case, the record fully supports the conclusion that consecutive sentences are necessary to protect the public from future criminal activity by this defendant. The State presented considerable evidence that the defendant killed the victim in order to obtain insurance money. The total amount of money that the defendant stood to gain from the victim's death was, by any measure, trivial. That the defendant would resort to murder over such a small sum does not bode well for the safety and well-being of members of the public in the future, if the defendant were to perceive some potential financial advantage that might be gained by the employment of violent means.

Consecutive sentences are also reasonable given the severity of the defendant's crimes. Although there is some evidence in the record that the victim abused the defendant, such abuse does not fully excuse the defendant's decision to ambush the victim by shooting him in the back of the head while (by her own testimony) he sat, unarmed, on the sofa. Afterward, when any fear of abuse had long dissipated, the defendant continued to complicate her crimes. The record reflects that she set a massive fire in an attempt to conceal evidence of the shooting and thereby needlessly destroyed a considerable amount of property and, worse still, needlessly endangered many lives – including those of her son, her neighbors, local firefighters, and even her own. While the fire raged, she avoided contact with public officials, causing needless concern over her safety and the safety of her son, and long after the fire burned out, she continued to mislead investigators, wasting considerable public resources.

To this day, the defendant has never fully accepted responsibility for her actions. She has consistently denied setting the fire and laid virtually all of the blame for the victim's

murder at his feet. The defendant has even placed serious qualifications on her claim that, if given the opportunity to do everything over, she would not resort to murder to resolve the situation. Under these circumstances, consecutive sentences are reasonably related to the severity of the defendant's offenses, and a twenty-five year effective sentence is justly deserved. The defendant's claim that the trial court erred by imposing partial consecutive sentences is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE